UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BENJAMIN JOHNSON,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>　　　　Defendants. | Civil Action No. 22-cv-3764 (TSC) |

**MEMORANDUM OPINION**

Plaintiff Benjamin Johnson sued several Metropolitan Police Department ("MPD") officers and the District of Columbia under 42 U.S.C. § 1983 and local law following a violent altercation with the police. Defendants moved for judgment on the pleadings, relying primarily on body-worn camera footage. Having considered the record and the briefing, the court will GRANT in part and DENY in part Defendants' Motion.

**　I.　　BACKGROUND**

Plaintiff alleges that he was approached by two MPD officers in northwest D.C. on June 29, 2022. Compl., ECF No. 1 ¶ 1. One officer asked Plaintiff to turn around, and the other reached for his firearm. *Id.* Frightened, Plaintiff fled, and the officers gave chase. *Id.* ¶ 2. Plaintiff then noticed a third officer approaching from the opposite direction with a hand on his firearm, and he "immediately stopped running and raised both of his arms above his head." *Id.*

An officer then "threw him to the ground and jumped on his back," and "at least one" officer "placed his knee and elbow across [Plaintiff's] neck," causing injury, "excruciating pain," and shortness of breath. *Id.* ¶¶ 3–4. The other officers present chose "to stand around and watch" rather than intervene. *Id.* ¶ 5. Plaintiff was ultimately arrested, and once a higher-

ranking officer arrived on the scene, they ordered Plaintiff be taken to the hospital. *Id.* ¶¶ 6, 27. After leaving the hospital, Plaintiff was taken to the jail and then released without charges the next day. *Id.* ¶ 28. In response to this incident, Plaintiff sought mental health treatment. *Id.* ¶ 29.

Plaintiff subsequently filed this suit against the officers involved in the altercation and the District of Columbia under 42 U.S.C. § 1983 and D.C. law. *See id.* ¶¶ 14–19. His Complaint enumerates six claims, including excessive force, *id.* ¶¶ 40–64 (Count I); bystander liability, *id.* ¶¶ 65–70 (Count II); and common law assault and battery, *id.* ¶¶ 71–81 (Counts III and IV). Plaintiff seeks compensatory and punitive damages totaling $40 million. *Id.* Prayer for Relief.

Defendants filed an Answer, ECF No. 7, attaching body-worn camera footage as exhibits, *see* Notice of Filing, ECF No. 9 at 1 (explaining that Defendants filed the body-worn camera footage as exhibits to the Answer). Defendants subsequently moved for judgment on the pleadings, ECF No. 10.

The body-worn camera footage shows the altercation from the perspective of three of the officers on the scene: Exhibit A is Defendant Dorghoud's footage, Exhibit B is Defendant Wilson's footage, and Exhibit C is an unnamed officer's footage. *See* Defs. Mot. for J. on the Pleadings, ECF No. 10 at 10–11 & n.1 ("Motion"). The footage depicts the police cruiser stopping in the middle of the road where Plaintiff was on his phone, Plaintiff fleeing as officers approached him, and the officers chasing him through the streets. Ex. A at 01:56–02:48; Ex. B. at 01:56–02:55. An unnamed officer was the first to reach Plaintiff, and already had him pinned to the ground when Officers Dorghoud and Wilson arrived. *See id.*; Ex. C at 01:59–02:17 (unnamed officer approaches Plaintiff, who holds his hands up before diving to the ground). Officer Dorghoud and another officer then placed handcuffs on Plaintiff while he was pinned

face-down on the ground. Ex. A at 02:49–03:15; Ex. C at 02:23–02:31. After Plaintiff was handcuffed, Officer Wilson's footage clearly shows Officer Dorghoud's knee and elbow on Plaintiff's neck, Ex. B at 02:59–03:03, 03:12–03:21, and later shows Officer Dorghoud place his knee on Plaintiff's upper back, *id.* at 03:55–04:06. Throughout the interaction, officers told Plaintiff to "spit it out" and not "eat that." Ex. A at 02:49–03:52; Ex. B at 02:52–04:15; Ex. C at 02:33–02:35. At one point, Officer Wilson grabbed and held Plaintiff's hair while trying to convince him to "spit it out." Ex. B. at 03:37–03:59. Plaintiff eventually informed the officers that he swallowed "weed." Ex. A at 04:04–05:02. Plaintiff told Officer Dorghoud, "you just fucking hit me in the fucking back for some weed," and Officer Dorghoud responded, "why the fuck did you run then?" *Id.* at 05:03–05:09. Plaintiff also exclaimed, "you punched me in the stomach—that's why I was out of breath," to which an officer responded, "maybe you shouldn't have fucking run then." *Id.* at 05:13–05:20. Finally, an officer told Plaintiff to stand up, and grabbed his arm to drag him to his feet. *Id.* at 05:35–05:45.

## II.     LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Very few of" the D.C. Circuit's "precedents discuss Rule 12(c), in part because judgment on the pleadings is rare." *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 760 (D.C. Cir. 2019). But the Court has made clear that "the party seeking judgment on the pleadings shoulders a heavy burden." *Id.*

On a motion for judgment on the pleadings, the court "accept[s] as true the allegations in the opponent's pleadings, and as false all controverted assertions of the movant," and affords "all reasonable inferences to the opponent's pleadings." *Id.* at 761 (citations omitted). And

"judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery." *Id.* (internal quotation marks and citation omitted).

### III.     ANALYSIS

Defendants moved for judgment on the pleadings on all counts. *See* Motion at 1. In his opposition, however, Plaintiff expressly "concede[d]" Count V (false imprisonment and false arrest) and Count VI (respondeat superior). Pl.'s Mem. of P. & A. in Supp. of Opp'n to Defs. Mot. for J. on the Pleadings, ECF No. 14 at 10. "Generally, a court is justified in taking a litigant at [their] word when [they] explicitly concede[] one or more issues." *Fleming v. Medicare Freedom of Info. Grp.*, No. 15-cv-1135, 2019 WL 6330719, at *2 (D.D.C. Oct. 24, 2019) (citing cases). Plaintiff also failed to make any arguments in his opposition defending Counts I, III, and IV against Officer Wilson or Count II against Officer Dorghoud. "[A]rgument[s] in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded." *Kone v. District of Columbia*, 808 F. Supp. 2d 80, 83 (D.D.C. 2011) (citation omitted). The court will therefore grant Defendants' motion as to Counts I, III, and IV against Officer Wilson; Count II against Officer Dorghoud; and Counts V and VI in their entirety. Consequently, the court will address only Counts I, III, and IV as they pertain to Officer Dorghoud and Count II as it pertains to Officer Wilson.

**A.     Body-Worn Camera Footage**

At the outset, Defendants argue that in deciding the Motion, the court should rely on the body-worn camera footage submitted as exhibits to its Answer.

"A motion for judgment on the pleadings under [Federal Rule of Civil Procedure] 12(c) must rely solely on matters within the pleadings." *Mpoy v. Fenty*, 901 F. Supp. 2d 144, 149 (D.D.C. 2012). The "pleadings," for the purpose of Rule 12(c), "include any 'copy of a written instrument that is an exhibit to a pleading,' Fed. R. Civ. P. 10(c), such as relevant and authentic

documents attached." *Liberty Mar. Corp.*, 933 F.3d at 760.  The D.C. Circuit has not considered whether a video exhibit is a "written instrument" under Rule 10(c).  But two other Circuits have concluded that video exhibits may be considered as part of a pleading in deciding motions to dismiss.  *Bogie v. Rosenberg,* 705 F.3d 603, 609 (7th Cir. 2013); *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017).  The court is unaware of any case considering whether video evidence may be considered in deciding a motion for judgment on the pleadings.

Citing *Scott v. Harris*, 550 U.S. 372, 380 (2007), Defendants contend that video footage may be dispositive if it shows that "no reasonable juror could believe" one party's version of the facts.  Motion at 9.  But *Harris* addressed a motion for summary judgment—not a motion for judgment on the pleadings.  550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  And *Harris* reasoned that the dispute must be "genuine" under Federal Rule of Civil Procedure 56, which provides that summary judgment is appropriate "if the movant shows that there is no *genuine* dispute as to any material fact," Fed. R. Civ. P. 56(a) (emphasis added).  550 U.S. at 380.

Neither the Federal Rules of Civil Procedure nor D.C. Circuit precedent similarly require a "genuine" dispute of material fact to defeat a motion for judgment on the pleadings.  Rather, the legal standard on a motion for judgment on the pleadings is more similar to the standard on a motion to dismiss, where the plaintiff's allegations are taken as true.  *Compare, e.g.*, *Liberty Mar. Corp.*, 933 F.3d at 761 (the court "accept[s] as true the allegations in the opponent's pleadings, and as false all controverted assertions of the movant" on a motion for judgment on the pleadings), *with Laughlin v. Holder*, 923 F. Supp. 2d 204, 208–09 (D.D.C. 2013) (in deciding

a motion to dismiss, the court presumes the truth of the factual allegations in the complaint and affords the plaintiff "every favorable inference that may be drawn from the allegations of fact" (citation omitted)).

Consequently, the question of whether body-worn camera footage may be part of the "pleadings" under Federal Rule of Civil Procedure 12(c) is a close one. Because Plaintiff does not contest Defendants' use of video footage to argue for judgment on the pleadings, and considering the footage does not affect the court's determination on the merits, *see infra* Sections III.B.iii, C.ii, the court assumes without deciding that it may consider the footage attached as exhibits to the Answer.

**B.     Counts I, III, and IV**

Defendants first contend that Officer Dorghoud is entitled to qualified immunity on Count I, the excessive force claim, and a qualified privilege under state law on Counts III and IV, the assault and battery claims.

*i.     Qualified immunity for use of excessive force*

Section 1983 provides a cause of action to sue for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting under color of law. 42 U.S.C. § 1983. Law enforcement officers acting in their official capacity, however, may be entitled to qualified immunity. "Qualified immunity exists to protect officers 'from undue interference with their duties and from potentially disabling threats of liability.'" *Lash v. Lemke*, 786 F.3d 1, 5 (D.C. Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), "[a]n official who asserts a qualified immunity defense can only be held liable if the plaintiff suing him establishes that the official 'violated a

constitutional right' that 'was clearly established' at the time," *Lash*, 786 F.3d at 5 (citation omitted). Courts may begin with either prong of this analysis, but often find it "easier . . . to see that the claimed right, whether it exists or not, is by no means 'clearly established.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 237 (2009)).

A right is clearly established if its "contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014) (citation omitted). "In other words, 'existing precedent must have placed the . . . question' confronted by the official 'beyond debate.'" *Id.* at 779 (citation omitted). A court should not define "clearly established law at a high level of generality," *id.* (citation omitted); rather, it should "determine the right at issue 'in light of the specific context of the case,'" *Lash*, 786 F.3d at 6 (citation omitted). "In determining whether officers strayed beyond clearly established bounds of lawfulness," the court "look[s] to cases from the Supreme Court, [the D.C. Circuit], as well as to cases from other courts exhibiting a consensus view." *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008) (citation omitted).

As the Supreme Court has held, "claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The reasonableness inquiry "is an objective one," but a "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396–97. Because "use of excessive force is an area of the law in which the result depends very much on the facts of each case . . . police officers are entitled to qualified immunity unless existing precedent

squarely governs." *Hedgpeth v. Rahim*, 893 F.3d 802, 809 (D.C. Cir. 2018) (citation omitted; formatting modified).

"In general, police officers have authority to use 'some degree of physical coercion' when subduing a suspect, as long as the amount of force used is reasonable." *Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011) (internal citation omitted); *accord Graham*, 490 U.S. at 395–97 ("not every push or shove, even if it may later seem unnecessary," constitutes a Fourth Amendment violation). The D.C. Circuit has held, however, that "[a]n officer's act of violence violates the Fourth Amendment[] . . . if it furthers no governmental interest, such as apprehending a suspect or protecting an officer or the public." *Johnson*, 528 F.3d at 975–76. In *Johnson*, the Court found that an officer violated clearly established law when he kicked plaintiff in the groin after plaintiff had "surrendered and posed neither a risk of flight nor any danger." *Id.* Similarly, in *Hall v. District of Columbia*, 867 F.3d 138, 157 (D.C. Cir. 2017), the Court denied judgment on the pleadings where plaintiff alleged an officer threw him up against a wall, dragged him out of a bar, and tightened handcuffs to the point of injury, when plaintiff posed no threat to the officer or others. *See also DeGraff v. District of Columbia*, 120 F.3d 298, 302 (D.C. Cir. 1997) (explaining that, in "cases in which [the D.C. Circuit has] found the use of significant force appropriate," the officers were "faced with an evasive suspect," "an escaping prisoner," or there was "evidence that [the officers] feared for their safety").

Several other Circuits have similarly found it clearly established that officers may not use force once a suspect has been subdued. *See Abbott v. Sangamon Cnty.*, 705 F.3d 706, 732 (7th Cir. 2013) (holding that "it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects"); *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (holding that "the use of force after a suspect has been

incapacitated or neutralized is excessive as a matter of law" in the context of an officer striking a suspect's knee after he had fallen to the ground); *Est. of Booker v. Gomez*, 745 F.3d 405, 425 (10th Cir. 2014) (explaining that using "force on a non-resisting subject" such as using a chokehold while the subject is "in a prone, face-down position on the ground" is excessive); *see also Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124, 141 (D.D.C. 2017) ("The use of force on a suspect who has already been subdued is plainly excessive." (citing *Baker* and *Abbott*)).

  ii. *Qualified privilege to use reasonable force*

Under D.C. law, "assault is 'an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim.'" *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (citation omitted). And "battery is an intentional act that causes a harmful or offensive bodily contact." *Id.* (citation omitted). "A police officer may have a qualified privilege in an assault and battery case," just as an officer may have qualified immunity in a § 1983 suit. *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009). An officer only maintains qualified privilege, however, if "the means employed" by the officer "are not in excess of those which [he] reasonably believes to be necessary." *Id.* (quoting *Evans-Reid*, 930 A.2d at 937). As the D.C. Circuit has explained, "an unreasonable use of force" under the Fourth Amendment "also is an assault and battery under D.C. law." *Hundley v. District of Columbia*, 494 F.3d 1097, 1101 (D.C. Cir. 2007) (citing *District of Columbia v. Jackson*, 810 A.2d 388, 392 (D.C. 2002)).

  iii. *Officer Dorghoud is not entitled to relief on Counts I, III, or IV*

Even considering the body-worn camera footage, Officer Dorghoud has not established his entitlement to qualified immunity or qualified privilege at this early stage.

Plaintiff's allegations and the body-worn camera footage depict Officer Dorghoud using force against Plaintiff when he was already subdued and presented no danger to the public or to the officers. Importantly, the footage confirms Plaintiff's core allegation regarding Officer Dorghoud's use of force—that he "placed his knee and elbow" across his neck. Compl. ¶ 25; *accord* Ex. B at 02:59–03:03, 03:12–03:21. The footage also shows that Plaintiff was subdued and not a danger to the officers or the public at that time. Plaintiff was already handcuffed, Ex. A at 02:49–03:15; Ex. C at 02:23–02:31, and the only "danger" he presented to anyone was to himself, as the officers were concerned that he was swallowing drugs, Ex. A at 02:49–03:52; Ex. B at 02:52–04:15; Ex. C at 02:33–02:37. Although Plaintiff initially fled from the officers, *see* Ex. A at 02:00–02:10, he threw his hands up in the air when an officer approached him from a different direction, Ex. C at 01:59–02:17. Indeed, Plaintiff alleges that the officers did not have probable cause to arrest him at all and he "was not a threat to the safety of the police." Compl. ¶¶ 32, 44–45.

Officer Dorghoud undeniably used force against Plaintiff by placing his knee and elbow against Plaintiff's neck. *See Scott v. District of Columbia*, 101 F.3d 748, 759–60 (D.C. Cir. 1996) (characterizing placing a knee on plaintiff's neck as a use of force). And using force against a subdued individual violates established law of the D.C. Circuit, *Johnson*, 528 F.3d at 976; *Hall*, 867 F.3d at 157, as well as several other Courts of Appeals, *Abbott*, 705 F.3d at 732; *Baker*, 471 F.3d at 607; *Gomez*, 745 F.3d at 424. Consequently, Officer Dorghoud has not shown that he is entitled to qualified immunity. *Liberty Mar. Corp.*, 933 F.3d at 760 (explaining that "the party seeking judgment on the pleadings shoulders a heavy burden"). And because, viewed in the light most favorable to the Plaintiff, Officer Dorghoud's use of force appears to

violate clearly established Fourth Amendment jurisprudence, he also has not shown that he is entitled to qualified privilege under D.C. law at this stage. *Hundley*, 494 F.3d at 1101.

Defendants argue that "officers are authorized to use force to gain control of a non-cooperating arrestee during an arrest." Motion at 10 (citing *Rogala v. District of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1998); *Scott*, 101 F.3d at 759; *Martin v. Malhoyt*, 830 F.2d 237, 261–62 (D.C. Cir. 1987); *Robinson v. District of Columbia,* No. 03-cv-1456, 2006 WL 2714913, at *4 (D.D.C. Sept. 22, 2006)). Defendants' argument, however, misses a key legal distinction: Officers are entitled to use force to subdue a suspect, but they are not entitled to use force once the suspect is subdued. Indeed, each of the cases Defendants cites involved steps officers took to subdue a resisting suspect. *Rogala*, 161 F.3d at 54 (pulling plaintiff from her car by her arm and throwing her to the ground was reasonable because she was resisting arrest); *Scott*, 101 F.3d at 759 (officers grabbing plaintiff and slamming him to the ground, and putting their knees on his neck, back, and legs was reasonable where plaintiff acted erratically and tried to escape from the police cruiser); *Martin*, 830 F.2d at 262 (officers grabbing plaintiff around the waist, throwing him into driver's seat, and slamming the door on his leg was reasonable because plaintiff was causing a traffic hazard and was a flight risk); *Robinson*, 2006 WL 2714913, at *4 (pushing plaintiff, shoving him into the hood of his car, holding him down while putting handcuffs on him was reasonable to effect the arrest). Use of force, however, is unreasonable once officers successfully subdue the suspect. *Johnson*, 528 F.3d at 976; *Hall*, 867 F.3d at 157; *accord Abbott*, 705 F.3d at 732; *Baker*, 471 F.3d at 607; *Gomez*, 745 F.3d at 424. And the body-worn camera footage in this case shows that Officer Dorghoud placed and held his knee against Plaintiff's neck even though Plaintiff was subdued and handcuffed.

Next, Defendants argue that the officer's knee was not on Johnson's upper back or neck "for a *significant* period of time as Johnson alleges," Motion at 11, and the officers used less violent means than in *Johnson*, Reply in Supp. of Mot. for J. on the Pleadings, ECF No. 15 at 4–5 ("Reply"). But whether the officer's knee and elbow were on Plaintiff's neck for seconds or minutes is immaterial because he still used force. *See Scott*, 101 F.3d at 759.

Finally, Defendants argue that the show of force was necessary to retrieve the marijuana Plaintiff "sought to destroy." Reply at 3. But there is no indication in the record that, by putting marijuana in his mouth, Plaintiff was putting the public or the officers at risk. To the contrary, Plaintiff risked his *own* well-being. In fact, one of the officers on the scene told Plaintiff, "you're only going to mess up yourself." Ex. B at 04:02–04:04. Nothing before the court indicates that any of the officers were concerned for their safety or the safety of the public, or that the use of force was necessary to retrieve the marijuana in Plaintiff's mouth.

**C.     Count II**

   *i.     Bystander liability*

Defendants also argue that Officer Wilson is entitled to qualified immunity on Count II, the bystander liability claim. Although the D.C. Circuit has not yet addressed bystander liability, courts in this district have adopted the Fourth Circuit's test: "an officer is held responsible for a constitutional violation if he: (1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *E.g.*, *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 72 (D.D.C. 2005) (citing *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002); other citation omitted); *accord Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 66–67 (D.D.C. 2018) (citing Court of Appeals cases).

Bystander liability is "an objective standard." *Wheeler v. Am. Univ.*, 619 F. Supp. 3d 1, 34 n.9 (D.D.C. 2022) (emphasis omitted). The concept "has been justified on the theories that an officer has an affirmative duty to intervene to prevent another officer's use of excessive force; that an officer may become a 'tacit collaborator' by failing to intervene; and that failure to intervene may amount to deliberate or reckless disregard of the plaintiff's constitutional rights." *Jackson*, 327 F. Supp. 3d at 67 (internal citations omitted); *see Randall*, 302 F.3d at 203 ("The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them.").

In *Jackson*, the court denied two officers summary judgment on a bystander liability claim where the officers failed to act or speak up while another officer punched and kicked plaintiff repeatedly. 327 F. Supp. 3d at 67. By contrast, in *Fernandors*, the court concluded that an officer was entitled to qualified immunity on a bystander liability claim because the evidence showed that he was unaware another officer had fabricated evidence to justify an arrest, and therefore had no reason to act. 382 F. Supp. 2d at 72–73; *accord Randall*, 302 F.3d at 205 (officers entitled to qualified immunity because no evidence indicated that they knew that plaintiffs were being detained at the police station against their will).

   *ii.*  *Officer Wilson is not entitled to qualified immunity*

At this stage, Officer Wilson has not demonstrated his entitlement to qualified immunity on Count II. First, Plaintiff alleges that Officer Wilson knew that Officer Dorghoud was violating the Fourth Amendment. Compl. ¶¶ 26, 66. Second, Officer Wilson had a reasonable opportunity to prevent the harm to Plaintiff. Officer Wilson was right next to Officer Dorghoud, and it is Officer Wilson's body-worn camera footage that most clearly shows Officer Dorghoud using force against Plaintiff. Ex. B at 02:59–03:03, 03:12–03:21. And since Officer Wilson was

"present for the entire sequence of events," he "may well have observed everything that" Officer Dorghoud "did." *Ingram*, 241 F. Supp. 3d at 147; *accord Matthews v. District of Columbia*, 730 F. Supp. 2d 33, 39 (D.D.C. 2010) (noting that bystander officers were "on the scene" and illegal strip searches were conducted "in the[ir] presence"); *Jalloh v. Underwood*, 464 F. Supp. 3d 125, 131 (D.D.C. 2020) (officer not entitled to summary judgment because he "had an earlier chance to prevent harm to" plaintiff). Finally, the Complaint alleges and the footage shows that Officer Wilson made no move to encourage Officer Dorghoud to remove his knee and elbow from Plaintiff's neck and upper back. *Accord Jalloh*, 464 F. Supp. 3d at 131 (officer not entitled to summary judgment because he "watched while the other officers" harmed plaintiff).

Defendants first argue that Officer Wilson could not have prevented harm to Plaintiff because "[a]ny injury [he] may have received was caused when he was first taken to the ground"—not when Officer Dorghoud's knee and elbow were on his neck and upper back. Motion at 12–13. Nothing in the record supports that assertion. Plaintiff alleges that Officer Dorghoud's actions "caused [him] to experience shortness of breath, as well as excruciating pain in his neck and back." Compl. ¶ 25. And Plaintiff is heard in the body-worn camera footage telling Officer Dorghoud that he is "out of breath." Ex A. at 05:13–05:20.

Next, Defendants argue that Plaintiff "was not beaten or assaulted by any officer involved," so Officer Wilson had no duty to intervene. Motion at 13. But the record indicates that Officer Dorghoud did assault Plaintiff, *see supra* Section III.B.iii. Moreover, that is not the test. The test is whether the officer "kn[ew] that a fellow officer [was] violating an individual's constitutional right." *Fernandors*, 382 F. Supp. 2d at 72 (citations omitted). Being "beaten" is clearly not the only circumstance in which an officer might know a fellow officer is violating the

Fourth Amendment.  *See, e.g.*, *Gomez*, 745 F.3d at 424 (chokehold); *Hall*, 867 F.3d at 157 (dragging and throwing plaintiff up against a wall).

Finally, Defendants contend that "there is no showing that" Officer Wilson "made the conscious decision not to act," Motion at 13, because he was focused on getting Plaintiff to spit out what was in his mouth while Officer Dorghoud had his knee and elbow on Plaintiff's neck and upper back, Reply at 6–7.  Maybe so.  But Defendants' argument mistakes the burden at this early stage in the litigation.  The court accepts Plaintiff's allegations in the Complaint as true so long as they are not clearly refuted by the body-worn camera footage.  *Supra* Sections II, III.A.  And the Complaint alleges that Defendants "chose to stand around and watch" rather than "ask[] the officer to remove his knee and elbow from [Plaintiff's] neck."  Compl. ¶ 26.  Moreover, although the altercation was relatively short, it was not so short that a bystander officer could not have acted.  *Contra Leach v. District of Columbia*, No. 19-cv-947, 2022 WL 1316436, at *11 (D.D.C. May 3, 2022) (three seconds was not enough time to expect a bystander to intervene).

## IV.   CONCLUSION

For the foregoing reasons, the court will GRANT in part and DENY in part Defendants' Motion for Judgment on the Pleadings, ECF No. 10.  An Order will accompany this Memorandum Opinion.

Date: March 20, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge